Good morning, Your Honors. Matt Larson of the Federal Defender's Office for Ms. Robles. Your Honors, Ms. Robles has standing to challenge the police seizing her car while it was being returned to her. The lead case that we cite on this is Padilla, which the government doesn't address at all. Padilla makes clear that one has standing to challenge a car search if one has either an expectation of privacy in the car or a property ownership interest in the car. As we've briefed, Ms. Robles has both of these interests and therefore has standing to challenge the police seizing her vehicle while Mr. Dominguez was returning it to her. Well, frankly, as I read Padilla, I didn't see much difference in what Padilla said than what was said in U.S. v. 1, 1977, Mercedes-Benz. And it seems to me that if I look at 1, 1977, Mercedes-Benz, property ownership is clearly one factor in considering whether the Fourth Amendment rights have been violated, but there are other factors to be considered. So ownership alone would be one factor we ought to look at, but then the owner, I mean, there are other factors. The owner, did they authorize another to use the car? Did they relinquish their possessory or expectation of privacy? Those are also factors that we ought to look at, aren't they? Certainly, Judge. And in the Mercedes-Benz case, the defendant had given her car to someone else for his exclusive use. That's not the situation here, Your Honor. Well, but I didn't see anybody else in the car. I didn't see any evidence in the case that would suggest that it was anything but their exclusive use. Your Honor, as we say in the briefs, if exclusive use simply meant someone else is driving the car when the police seize it, that would mean that the police could seize the car as it's being returned after dinner by a valet or after a tune-up by a mechanic, and the owner would have no standing to challenge that seizure. Well, we don't have any of that here. That is essentially the situation. The evidence that the government proffered, Your Honors, showed that Ms. Robles owned this car and that she, except for this one stop, was the exclusive user of the car for the entire time that they had records for it. When they stopped the car, Mr. Dominguez said it's her car. What precautions did she take to suggest that this was more than just allowing the defendant or allowing the person to be stopped, use her car, without any restrictions? What defenses did she have for that? Well, the undisputed evidence is that Mr. Dominguez was on his way to return it to her. He had borrowed it, and she had not given it to him for his exclusive use. That would be a case where, say, a parent buys a car for their child, say, as a graduation gift and gives it to the child to use exclusively. Arguably, there, the person would have given away all interest in the car. But that's not the situation here. Again, the evidence is undisputed on this point. Did she voluntarily turn over the car to another? As would anyone... Did she do that? Yes, Your Honor. I mean, that's one factor. You're suggesting it wasn't exclusive use. We can have comment about that, I guess. Did she take any precautions to safeguard any privacy interests she may have in the car? The precaution was that he was returning it to her. She hadn't given... That's the only precaution we can find in the record? Indeed. Okay. I'm just trying to focus on the factors that I look at when I look here. Certainly. Ownership was one. She turned over voluntarily to another. Whether it was for his exclusive use, you dispute. No precautions to safeguard. At that point, what else do we look at? We look at the property interest with which this Court and the Supreme Court... The ownership. Is that what you're talking about? Indeed, Your Honor. Okay. Which this Court and the Supreme Court have said is a basis for one to have standing. In the Soldow case in the Supreme Court, the police came along, they took someone's mobile home, and they removed it from the property. Now, there was no violation of privacy in that case. The police didn't go into the home and search through it. They simply moved it. And the Supreme Court had no trouble in finding, unanimously, that this was a violation of the person's Fourth Amendment rights, arguably, or at least that the person had standing to argue that it was a violation of their Fourth Amendment rights. This Court said, plainly, in Lebanon, the Fourth Amendment protects against unreasonable interference in property, regardless of whether there is an invasion of privacy. So I think the case law since Mercedes Bayes... Counsel, it certainly protects against it in the case of a seizure. But I guess why does it protect against it in the case of a search if the owner has not given some instruction to the person they loaned their car to, say, like, now, don't consent to let anybody search my car. Well, here, Your Honor, what we're challenging is the stop. And, of course, a stop is a seizure under the Fourth Amendment. And so we're not challenging the search of the car, which happened later because Mr. Dominguez consented to that. What we're challenging is the stop of the automobile, which was a seizure under the Fourth Amendment and which Ms. Robles has standing to object to because she's the owner of the car and as the owner has a privacy interest in it and because she did not give the car away to Mr. Dominguez for his exclusive use, as was apparently the situation in the Mercedes-Benz case. Well, my worry about that is I looked at Mercedes-Benz, and then I looked at other cases, and my worry is whether those courts are really suggesting that the stop really amounts to the seizure you're really talking about. For instance, I look at Guzman-Padilla. In Guzman-Padilla, the court seemed not to equate the stop into the seizure. It only became a seizure when they deflated the tires. Well, Your Honor, I'm flipping through my reply brief now because I quote a Ninth Circuit case saying that a car stop is a seizure under the Fourth Amendment. Well, I understand, but I'm just trying to suggest, I'm trying to see, I'm trying to, the Ninth Circuit case 2009, U.S. Guzman v. Padilla, our court said in looking at the same kind of stop, they were analyzing the stop of the vehicle, and that case it was the Border Patrol agents, and they really didn't think it was a seizure. They didn't even talk about it as a seizure. They didn't even, though they said it was a seizure, they equated the stop into the seizure we're really talking about here when the tires were deflated. So I'm trying to harmonize. I think there can be, to harmonize it, Your Honor, I think there are degrees of invasion. It may be more invasive to stop a car and then let the air out of the tires, but stopping the car is a seizure all the same. This court said an automobile stop by police is a seizure within the meaning of the Fourth Amendment, and that's clear in Ninth Circuit law. Unless Your Honors have other questions about standing, I'll move to the... Yeah, I do. I'm still going back with Judge Gould's, the factors that he referred to previously, and going over those again, the amount of control, whether the defendant authorized the person to use the vehicle. It's the lack of control. I know it was only for two days, wasn't it, the car had been taken? Indeed. The car had been taken for two days, but during that two-day period, roughly two days, the person who was driving, Robles, had complete and unfettered access to that vehicle. He could have taken it anywhere he wanted to. There had been no restrictions placed upon him by the owner of the vehicle. How do you get around that part? He could have put numbers of people in that vehicle. He could have put personal items in that vehicle. He had the exclusive control over the vehicle at the time it was stopped. Isn't that correct? Yes, Your Honor, but with respect, it is not that there were no restrictions placed on his control. The restriction was that you can borrow my car and you have to return it to me, and that's what he was doing. Ultimately, but during the time period that you have my car, you have unfettered discretion to do whatever you would like, to go wherever you would like, to see whoever you would like, to transport whatever you would like. That is strictly up to you. There's no indication that Ms. Robles ever gave such permission. There's no indication that she, on the other hand, though. By Your Honor's example, the same could be said of someone who, a mechanic who takes the car on a joyride irresponsibly, or a valet who buys drugs on his way to returning it to the owner. But that isn't, those particular examples have nothing to do with this particular case because in those examples nobody's turning the car over to somebody to do whatever he wants to do, which is what I understood happened here. In that case, you're taking it, they turn it over to bring it to them, or they turn it over to fix it, not to use it for their own interest. Your Honor, I would just say the government has cited no authority that letting someone borrow your car divests you of a Fourth Amendment standing claim to challenge the seizure. The Mercedes-Benz case said... Well, but just a minute. What we're doing is focusing on factors. The factors we have to look at, and that's why we're having you respond because we're trying to get all those factors put together, and ownership is not the sole factor. So let's go through the factors then, Your Honor. She owned the car, but for this one stop she was the exclusive user of the car for the entire period of time that the government had records about it. She put the restriction on Mr. Dominguez that, yes, he could borrow it, but he had to return it to her, and that's what he was doing. So that's a restriction, all right. Yes, Your Honor. And that's what he was doing when the police stopped him. And anything else? Under the totality of those circumstances, Ms. Robles has standing to challenge the police seizing her car while it's being returned to her. Okay. Counsel, I might be taking over your time, but I do want to hear your answer to another question. That's this. Assuming she has standing, you know, why isn't the stop permissible, given the factors that we stressed in Valdez-Vega in the decision? Now, I know you say several times that the district court had thought there was a problem with the stop, but the district court was looking at the opinion by Judge Pragerson in Valdez-Vega for the three-judge panel that had been vacated when we took it in bank. And I guess assuming standing, what's the problem with the stop? The person was changing lanes, didn't give eye contact, had Mexican plates. The officer, in his experience, was suspicious. But why couldn't the officer stop the car? We're talking about the stop of Mr. Dominguez, correct, Your Honor? Yes. Right. So the facts were that Mr. Dominguez was driving lawfully toward Mexico down a major interstate highway. He wasn't speeding, as the person was in Valdez-Vega. He wasn't weaving in and out of traffic, as the person was in Valdez-Vega. He wasn't braking in front of other cars, causing them to brake, as he was in Valdez-Vega. He also wasn't driving the type of a pickup truck that has been linked to as he was in Valdez-Vega. The facts here are completely unlike those in Valdez-Vega. The totality of the facts here, Your Honor, is that a man was driving a clean, white car lawfully down a major highway that 300,000 people traverse every day toward Mexico. He broke no traffic law. His windows weren't tinted. His car was not heavily laden down. It wasn't dusty with fingerprints on it. He wasn't swerving. He wasn't evading the police. He wasn't, you know, doing anything that gave rise to a reasonable belief that then and there he was engaged in criminal activity. Didn't the police at the time, though, when they did a records check based on the license plate, the police know the car's been traveling back and forth into Mexico maybe, you know, five times a month for a half year. And they also have some sort of flag that says there's a moderate risk of criminal activity. Yes, Your Honor. Is that right? Let's just take those facts. Certainly, Your Honor. The officer has that flag, doesn't know why it's there, but he's got the flag and he looks at the other stuff and he has a suspicion. Why isn't that a reasonable suspicion to make a stop? Well, about the flag, Your Honor, the officer admitted at the suppression hearing that he didn't know what it meant. But he knows it says there's a risk of criminal activity. He doesn't know why it's put on there, but why does that matter? Because what the law requires are specific and articulable facts to believe the person to be stopped is engaged in crime. The agent admitted that this alert is an automated thing that comes from a computer. He didn't know how the information got in there. He didn't know who put it in there. He didn't know what it meant. And, tellingly, the government doesn't really even rely on it in this case. It was essentially an automated response that did not provide what the law requires, which are specific and articulable facts giving rise to reasonable suspicion. As to the records check, Your Honor, it showed that this is a car that Ms. Robles owns. She crosses the border regularly and she's in her 30s. Now, if anyone fitting that profile could be pulled over, as long as, you know, her friend was borrowing the car, it would sweep a large number of people into this general suspicion of criminality. This Court over and over has said profiles are fine to a point, but they can't sweep in a large number of people because that's not reasonable suspicion. It has to be particularized. It has to say, what is this person doing right now that I can see that makes me think that they're probably engaged in a crime? Are they swerving? Are they trying to evade me? Are they loaded down? Does their car come from a town linked to drug smuggling or alien smuggling? None of that information is here, Your Honor. The information here, the totality of the facts, is that a man was driving lawfully down a major highway. Okay, I think we got your point. Thank you very much. I think your time has ended. We'll turn to the government. May it please the Court, Ellen Lansdell on behalf of the United States. In this case, the district court correctly found that appellant failed to meet her burden of establishing a violation of her Fourth Amendment rights at the first stop on January 22, 2012, when she was not driving, was not present, and had lent her car to Dominguez without restrictions on his use and without taking any steps to safeguard her privacy. As an initial matter, we don't even know that appellant is the true owner of the car. It was her burden to establish ownership, but her declaration in which she refused to submit to cross-examination on it. She answered a single question regarding ownership, saying that she had bought the car in November of 2011. But when asked who she bought it from, where she bought it, or how much she paid for it, she refused to answer. The court struck her declaration. In the absence of evidence of ownership, we don't know whether her name was written on the registration merely to ease the border crossings. Even if appellant is the true owner of the car, what interest does she have in whether or not that car is stopped while traveling on a highway when she has given it over to someone for their exclusive use? So how do I distinguish Padilla? In Padilla, which basically the Supreme Court struck the co-conspirator rule that had been established by the Ninth Circuit, they say that the question is whether there's a property interest or a privacy interest that has been interfered with. And in the cases cited by the appellant, Saldal, Lavon, Miranda, all of those cases discuss a seizure as being a meaningful interference in a possessory interest. So if we look at the possessory interest that appellant claims she had to the car was stopped on a highway. The government... There's no question it's a seizure, right? We have a lot of cases suggesting that it is. The stop on the highway? Yes. I respectfully disagree, Your Honor. All right. The case that appellant cites to, Ninth Circuit case Garcia, is really talking about the seizure of the passengers in the vehicle. The seizure of the car is incidental. When you look at the case that Garcia is referring to, Supreme Court case Delaware v. Pruse, the case is discussing the intrusions on the individual autonomy, individual's autonomy. They talk about the stop, the questioning, the visual inspection, the generating of concern or even fright on the part of lawful travelers. Defendant suffered none of these intrusions because she was not driving and she was not present. She cannot claim that her possessory interest was meaningfully interfered with, and because she was not a passenger in the car, she was not seized. And she cannot claim, like the passengers in Garcia or the passengers in Delaware v. Pruse, that she suffered a seizure in the meeting of the Fourth Amendment. In fact, she would only have known about the stop if Dominguez had told her. She otherwise would have been none the wiser. Counsel? Yes, Your Honor. Judge Gould, let's assume for a minute that your position on no standing or no significant issue of privacy were rejected, and you had to justify, was the stop valid based on reasonable suspicion in light of Valdez-Vega? So what's your best argument on that? And I mentioned a few factors that I had in mind, but I think that there was also like a key ring that only had one key on it that was thought significant below. But what is the proper analysis of reasonable suspicion in the government's Yes, Your Honor. And I'm glad you asked that, because the government is not urging the court here to make a difficult standing issue, because in light of the en banc decision in Valdez-Vega, this case, it's not hard to find the reasonable suspicion necessary for the stop. To begin with, the factors cited by Agent Gonzalez, who was a 15-year veteran of drug smuggling in the very area where the stop occurred, he testified that I-15, this corridor where the car was stopped, is notorious for narcotic smuggling, and it's used frequently by drug smugglers bringing in drugs from Mexico into the United States. He also testified that he saw a white, freshly washed car. And in his experience, the majority of cars that he finds that are engaged in drug smuggling are white because they are nondescript and less likely to draw attention to themselves. He also testified that the majority of cars he sees drug smuggling appear to be freshly washed. He saw Mexican license plates. He testified that a large percentage of narcotic smuggling vehicles have Mexican license plates. He saw a male traveling alone, and this was significant to him because in the majority of drug seizures, he finds one occupant in the car, usually a male. He saw the driver leaning over, appearing as though he was attempting to conceal a use of a cell phone or a two-way radio. He saw, as you mentioned, one key on the ignition ring. He was in his Border Patrol Tahoe, peering down into the sedan, as he wrote alongside it, and he said the reason why this was significant to him was because in the majority of cases where they find drugs in cars being smuggled, there is one key on the ignition ring. There are no personal keys, no house keys, no office keys. And he said based on his post-arrest interviews, he's come to understand that this is because many of these drug smuggling vehicles are fleet vehicles owned by a drug trafficking organization, and they are loaded up with drugs, brought across the border, and driven back into Mexico to be loaded up and taken across the border for their next run. So this added to his reasonable suspicion. He also pulled up alongside the car and drove parallel to the car for two miles while looking at the driver. And he said that the driver never once acknowledged his presence. And he said this was also suspicious to him because in his experience, when individuals are attempting to avoid law enforcement, they will not even acknowledge them. And so he drove next to that car for two miles and not once did the driver look over at him. Finally, as you mentioned, the records check provided a wealth of information that distinguished this reasonable suspicion from all of the cases that Appellant cited in her brief, in that it wasn't just a suspicion that the car had recently crossed the border. He had actual knowledge that two days earlier, this car had crossed from Mexico into the United States. It wasn't just that it was near the border or that it was known to be registered to a certain part of Mexico. He had actual knowledge that this car had crossed two days earlier. But more suspicious to him was that the driver who crossed the car into the United States was a woman. And two days later, there was a man who was driving the car back down to Mexico. And he said this was extremely suspicious to him because in the majority of cases where he sees drug smuggling, when one adult crosses the border with the car and another adult is driving the car later, contraband is often found. And I'm trying to remember how he said the majority of times someone else is driving the car other than the person who crossed, that car is found with contraband. And there was no adult male associated with any of the border crossings. The only adult was the Appellant. And again, as you mentioned, Appellant had crossed the border five times in the last month through San Ysidro Port, which is a known drug smuggling port, which also added to his suspicion. And she had crossed the border 31 times in the past six months in four different cars with people born in the 1980s or 1990s. And it was his testimony. And what is the significance, if any, of the flag of risk of potential criminal activity with the car if nobody knows why it was put on there? Well, he testified that the text alert, he understood to mean that there was an amalgamation of factors that are put into the system and the car pops up with a certain alert. And in this case, it was a medium risk of criminal activity. And again, it's all these factors taken together that create the totality of circumstances viewed through the lens of the trained officer that amount to reasonable suspicion. It's not, as the court said in the en banc opinion of Valdez-Vega, it's not that any one factor is presumptively given no weight. All of the factors are looked at together in the context of the stop. And so the text alert merely added to his already lengthy list of factors to substantiate his reasonable suspicion. If, in fact, we find that she does have standing to challenge, and if, in fact, we find that the stop was unconstitutional, is the case over? The government concedes that if the first stop is unconstitutional, that taint would likely spill over into the second stop. So there is nothing, there are not enough factors in the second stop that are outside the taint which the government would argue. No, Your Honor. Okay. They basically stopped it the second time, I thought, in part because they checked the license and they knew it had a secret compartment. Yes, that's right. But I understand Judge Smith to be asking that if the first stop was deemed unconstitutional, whether or not that information could legally be used for the second stop. Well, I'm not suggesting that. What I'm suggesting is, if there was, in the first stop, it was unconstitutional, then all information used from the first stop would not be available in the second stop. Yes, Your Honor. And so therefore, with the second stop, are there enough indications to give a chance to stop without having all of the information that was gathered from the first stop? And I didn't think the government was arguing that, but they have in other cases, so I'm just trying to make sure. In our brief, we conceded that the taint would spill over. I thought you conceded that because I thought the second stop was based significantly on the fact of the knowledge of the compartment. Yes, Your Honor. That was gained in the first stop. Yes, Your Honor. So I think if you lose on standing and you lose on reasonable suspicion for the first stop, then appellant wins and you lose. Yes, Your Honor. Thank you. I can argue it for the sake of arguing it. I just wanted your argument because I've thought about that. Thank you for your argument. I'll give counsel. I stopped you. I took them over as much as I took you over. But Judge Gould's rather good to those who are on the appellant. He always gives them a little extra time. You've got 30 seconds. I appreciate that, Judge. Just to speak to this point of how, you know, in his experience, a lot of single-manner criminals, a lot of white cars contain contraband. This Court has said, you know, you can't just give an explanation that basically makes no sense. Inferences based on training and experience have to reasonably explain why a fact suggests someone is involved in a crime. And an inference is not reasonable when it's based on characteristics that are common to simply too many people to reasonably suggest criminality. I would direct the bench to the Sigmund Ballesteros case in our briefs, which talks about this point. If you simply say, you know, the reason I stopped this car is because in my training and experience, men are often smuggling drugs, this Court is going to reject that as a reason to stop, because it's not reasonable to say, you know, because I've stopped a man, he's involved in a crime, because so many people fit that profile. It can't be a broad profile. It has to be based on specific and particular facts, and there were none here. Appreciate your argument. What about the key on the key? What about the single key on the key ring that the officer observed while he drove by for two miles and can't get eye contact, but he sees there's only one key on the key ring? Yes, Judge. A single key is what you would have if you're borrowing a car or you're renting a car. It doesn't suggest you're involved in a crime because your key chain has only the ignition key on it. And in this case, the car was being borrowed. Ms. Robles didn't give her house keys to Mr. Dominguez. She gave him a car key to use the car. It doesn't suggest that Mr. Dominguez was committing a crime because there was one key on his key chain. And to make that assumption, as the government urges, would sweep too many people into this net of suspicion, and this Court over and over again has rejected such broad generalizations. Any other questions, Judge Gould? No, I think it's very well argued by a felon and a pet. Thank you very much. Then the case 13-50098 is submitted.
judges: England, GOULD, SMITH